UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

_____
                                              )
LAWRENCE R. GLAZER et al,                     )     CASE No.:    1:09cv1262
                                              )
PLAINTIFF                                     )     JUDGE BOYKO
                                              )     Magistrate Judge White
vs.                                           )
                                              )
CHASE HOME FINANCE LLC et al.                 )     **MOTION FOR SUMMARY**
                                              )     **JUDGMENT ON THE ISSUE**
                                              )     **OF LIABILITY UNDER THE**
DEFENDANTS                                    )     **FDCPA; MEMORANDUM OF**
                                              )     **POINTS AND AUTHORITIES**
                                              )
_____)

Pursuant to Federal Rule of Civil Procedure 56 Plaintiff, Lawrence R. Glazer, hereby moves

this Honorable Court for partial summary judgment on the issue of liability under the FDCPA

against Reimer Arnovitz Chernek and Jeffreys, PLA, Mr. Ronald Chernek Esq., and Mr. Darryl

Gormley Esq [hereinafter collectively 'RACJ']. If granted, this summary judgment motion

would leave unresolved only the issues of calculation of damages, declaratory relief, and

injunctive relief.

Summary judgment on the issue of liability under sections 1692(d), 1692(e), 1692(f), and

1692(g) is warranted because Plaintiff has presented overwhelming, uncontroverted evidence

that Defendants violated the Fair Debt Collection Practices Act ("FDCPA") and because no

genuine issues of material fact require a trial on the issue of liability. *See Adickes v. S.H. Kress &*

*Co.*, 398 U.S. 144, 157 (1970).

The uncontroverted evidence, which includes public records and Defendants' own

admissions and other discovery responses, demonstrates that Defendants are debt collectors who

initiated litigation in Ohio state courts in order to collect unsecured debts owned by FNMA, all the while misrepresenting the name of the true creditor, the legal status of the debt, and the amount of the debt. Defendants supported their litigation position and sought to foreclose by creating, recording, and using assignments of mortgage containing deliberate and material misrepresentations of fact. Compounding these unlawful practices, Defendants used unfair and deceptive tactics to collect on these debts and reaped financial benefit by adding fees and costs for unnecessary services and for services never performed.

The uncontroverted evidence also demonstrates that the individual defendants, Mr. Chernek and Mr. Gormley, participated in all aspects of Defendants' collection practices, and that they knew or should have known that the firm's collection and litigation practices violated the FDCPA.

Plaintiff, on behalf of himself and on behalf of two classes of similarly situated individuals, seeks to establish liability for Defendants' large scale violations of the FDCPA and will ask the Court to order (1) that Defendants be enjoined from using bogus assignments of mortgage in foreclosure filings; (2) that Defendants be enjoined from adding unnecessary fees to debts allegedly owed; (3) an award of actual damages sustained by Plaintiff and the members of the classes; (4) an award of statutory damages of $1,000.00 per affected consumer; and (5) an award of reasonable attorney fees.

Dated: 30 June 2015

Respectfully Submitted by
__    *s/ Nicolette Glazer*_____
Nicolette Glazer Esq. CSB 209713
LAW OFFICES OF LARRY R GLAZER
1875 Century Park East #700
Century City, CA 90067
Tel: (310) 407-5353; Fax: (310) 407-5354
nicolette@glazerandglazer.com

## MEMORANDUM OF POINTS AND AUTHORITIES

## TABLE OF CONTENTS

Issue Presented for Summary Adjudication.................................................................... 7

Argument........................................................................................................................ 7

    I.Standard for Adjudication under Rule 56............................................................7

    II.The Fair Debt Collection Practices Act............................................................ 7

        A.Plaintiff is an aggrieved party with standing to sue and recover.................................. 8

            1.RACJ's false representations that the Klie note had been lost are
actionable under section 1692e as a misrepresentation of the
character and legal status of the debt.....................................................13

            2. RACJ's false representations that CHF was the holder of the Klie Note
are actionable under section 1692e as a misrepresentation of the
character and legal status of the debt.....................................................15

            3.RACJ's false representations in the assignments of mortgage are
actionable under section 1692e as misrepresentations of the character
and legal status of the debt.................................................................... 18

            4. RACJ's false representations in the FDCPA notices attached to the
foreclosure complaints are actionable under section 1692e as a
misrepresentation of the character    and legal status of the debt         22

            5. RACJ's failure to identify FNMA's interest in the loan, note, and
mortgage is a misleading and/or deceptive means in
violation of 1692e(10)............................................................................ 22

            6. RACJ violated the FDCPA by collecting or attempting to collect
unauthorized and unearned fees         22

            7.  RACJ inflated fees and double billed for title work by
creating and 'hiring' NovaTitle to provide preliminary, subsequent,
and final judicial reports for all of its foreclosure cases...........................26

            8.  RACJ violated section 1692g by continuing collection
efforts without validating the debt...........................................................29

            9.  RACJ violated section 1692d and 1692f by Advertising
the property for a sheriff sale without a decree of

foreclosure and directing Safeguard to enter and    disable the property without a present right of possession..........................................................................................30

Conclusion ................................................................................................................32

## TABLE OF AUTHORITIES

**Cases**

*Adams v. Law Offices of Stuckert & Yates*, 926 F.Supp. 521 (E.D. Pa. 1996) ............................23

*Amway Distributors Benefits Ass'n v. Northfield Ins.Co.*, 323 F.3d 386 (6th Cir. 2003) .............7

*Anderson v. Liberty Lobby*, Inc., 477 U.S. 242 (1986) ..................................................................7.

*BAC Home Loans Servicing, L.P. v. Hall*, 2010-Ohio-3472 .........................................................21

*Baker v. G.C. Servs. Corp.,* 677 F.2d 775 (9th Cir.1982) ..............................................................9

*Boyd & Harrison v. Wexler*, 275 F.3d 642 (7th Cir. 2001) ..........................................................14

*Broadnax v. Greene Credit Service*, 106 F.3d 400 (6th Cir. 1977) ..............................................11

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ..;.........................................................................7

*Clomon v. Jackson*, 988 F.2d 1314 (2d Cir. 1993)..........................................................................8

*Edwards v. McCormick*, 136 F. Supp.2d 795 (S.D. Ohio 2001) ...................................................23

*Fox v. Citicorp Credit Services, Inc.*, 15 F.3d 1507 (9th Cir. 1994) ..............................................8

*Gathuru v. Credit Control Services, Inc.,* 623 F.Supp.2d 113 (D.Mass. 2009) ...........................26

*Gillie v. Law Office of Eric A. Jones, LLC,* Case No. 14-3836 (6th Cir. 2015) ............................9

*Glazer v. CHF et al,* 704 F.3d 453 (6th Cir. 2013) ........................................................... In passim

*Haddad v. Alexander, Zelmanski, Danner & Fioritto, PLLC,* 698 F.3d 290 (6th Cir. 2012)...11.29

*Harris v. Option One Mortg. Corp.*, 519 F. App'x 909 (6th Cir. 2013) .......................................17

*JP Morgan Chase Bank v Butler,* 2013 NY Slip Op 51050, 40 Misc 3d 1205 (July 5, 2013) .....17

*Kaymark v. Bank of America*, N.A.,783 F.3d 168(3d Cir. 2015). ................................................26

*M & T Bank v. Steel*, 2015-Ohio-1036   ....................................................................................21

*McLaughlin v. Phelan Hallinan & Schmeig*, 2014 U.S. App. LEXIS 12028 (3d. Cir. 2014).......26

*Miller v. Wolpoff & Abramson, L.L.P.,* 321 F.3d 292 (2d Cir.2003) ...............................................9

*Montgomery v. Huntington Bank*, 346 F.3d 693 (6th Cir. 2003) ....................................................8

*Nationstar Mtge., L.L.C. v. West*, 2014-Ohio-735 ......................................................................21

*Phillips v. Asset Acceptance, LLC,* 736 F.3d 1076 (7th Cir.2013) ................................................9

*Pollard v. Law Office of Spaulding*, 766 F.3d 98 (1st Cir., 2014) .................................................9

*Sherlock*, 2008 U.S. Dist. LEXIS 21794, at *12 (2008) ................................................................9

*Slenk v. Transworld Sys.*, 236 F.3d 1072 (9th Cir. 2001) ...........................................................11

*Tourgeman v. Collins Fin. Servs., Inc.*, 755 F.3d 1109 (9th Cir., 2014) ........................ In passsim

*Tyler v. DH Capital Mgmt., Inc.*, 736 F.3d 455 (6th Cir. 2013) ....................................................9

*U.S. Bank Nat'l Ass'n v. Marcino*, 908 N.E.2d 1032 (Ohio Ct. App. 2009)....................................8

*Wallace v. Washington Mutual Bank, & Lerner, Sampson & Rothfuss,* 683 F.3d 323

(6th Cir. 2012) .............................................................................................................................17

*Williams v. Javitch, Block & Rathbone, LLP,* 480 F. Supp. 2d 1016 (S.D. Ohio 2007) ................8

*Wilson v. Draper & Goldberg*, P.L.L.C., 443 F.3d 373, 376 (4th Cir. 2006) ..............................11

*Wright v. Fin.Serv. of Norwalk, Inc.*, 22 F.3d 647 (6th Cir. 1994) (*en banc*) .................................8

## Statutes

15 U.S.C. §1692a et seq.  ..................................................................................................in passim

R C. §2921.13.............................................................................................................................22

R.C. §1301.01.....................................................................................................................in passim

R.C. §1319.12.............................................................................................................................22

R.C. 1301.31................................................................................................................................15

**Issue Presented for Summary Adjudication**

      Whether Defendants, based on the undisputed facts and as a matter of law, violated sections 1692d, 1692e, 1692f, and/re 1692g of the Fair Debt Collection Practices Act by initiating a foreclosure lawsuit in the name of CHF to collect a FNMA owned debt; by preparing, filing, and recording documents containing material false, misleading, and/or deceptive statements; by collecting, or attempting to collect, unauthorized, unearned, and/or inflated fees for services allegedly performed in connection with the collection of a defaulted debt; and/or by harrassing consumers in connection with the collection of a debt by committing unauthorized entries into private property.

**Argument**

### I.   *Standard for Adjudication under Rule 56*

      Summary judgment, or partial summary judgment, is proper if the admissible evidence before the court "shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." *See* Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A factual issue is "genuine" when there is sufficient evidence such that a reasonable trier of fact could resolve the issue in the non-movant's favor; a factual issue is "material" when its resolution might affect the outcome of the suit under the governing law. *See Anderson v. Liberty Lobby*, Inc., 477 U.S. 242, 248 (1986). The mere existence of some factual dispute will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact. *See Anderson*, 477 U.S. at 248-52. Instead, whether a summary judgment is appropriate depends upon "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *See Amway Distributors Benefits Ass'n v. Northfield Ins.Co.*, 323 F.3d 386, 390 (6th Cir. 2003)

### II.   *The Fair Debt Collection Practices Act*

      Congress enacted the Fair Debt Collection Practices Act [hereinafter 'FDCPA'] in response to a national concern over "the use of abusive, deceptive and unfair debt collection practices by many debt collectors." *See* 15 U.S.C. §1692(a). The FDCPA sets forth a nonexclusive list of

prohibited debt collection practices and encourages the use of class actions to accomplish the Act's remedial purpose. *See id.*; *see also Tourgeman v. Collins Fin. Servs., Inc*., 755 F.3d 1109 (9th Cir., 2014) (The language of the statute "demonstrate[s] that Congress intended to achieve its goal of regulating debt collectors' conduct by motivating consumers to bring enforcement actions if they are the targets of unlawful collection efforts.")

Although Defendants have engaged in violations of several provisions of the FDCPA, a single violation of a single provision is sufficient to establish liability. *See Williams v. Javitch, Block & Rathbone, LLP*, 480 F. Supp. 2d 1016, 1021 (S.D. Ohio 2007); *Clomon v. Jackson*, 988 F.2d 1314, 1318 (2d Cir. 1993). Further, a single deed can violate more than one provision of the Act. *See Fox v. Citicorp Credit Services, Inc.*, 15 F.3d 1507 (9th Cir. 1994).

To meet his burden of proof and persuasion under the FDCPA, Plaintiff must prove four elements: (1) the plaintiff is a natural person harmed by violations of the FDCPA, or is a "consumer" within the meaning of 15 U.S.C.A. §§1692a(3) for purposes of a cause of action under 15 U.S.C.A. §§1692c, 1692e(11), 1692g; (2) the "debt" arises out of a transaction entered into primarily for personal, family, or household purposes; (3) the defendant collecting the debt is a "debt collector" within the meaning of 15 U.S.C.A. §1692a(6); and (4) the defendant has violated, by act or omission, a provision of the FDCPA, 15 U.S.C.A §§1692a-1692o.

### A.  Plaintiff is an aggrieved party with standing to sue and recover.

Lawrence Glazer invokes four separate provisions of the FDCPA**:** 15 U.S.C. §§ 1692d, 1692e, 1692f, and 1692g. Of these four sections, relief is limited to "consumers" only under §1692g. The Act defines "consumer" as "any natural person obligated or alleged to be obligated to repay a debt." *See* 15 U.S.C §1692a(3). The 6th Circuit has consistently held that for purposes of sections 1692d, 1692e, and 1692f "any person who has been harmed by a proscribed debt collection practice" can sue for damages under §1692k(a)(2)(A)." *See Montgomery v. Huntington Bank*, 346 F.3d 693, 696 (6th Cir. 2003), citing *Wright v. Fin.Serv. of Norwalk, Inc.*,

22 F.3d 647, 649 n.1 (6th Cir. 1994) (*en banc*). (observing that §1692c "appears to be the most restrictive of the FDCPA's provisions. The other provisions are not limited to 'consumers,' and thus are broader than §1692c: 'any debt collector who fails to comply with any provision of this subchapter with respect to any person is liable to such person.'")

Under the Act a person possesses a right of action even where the defendant's conduct has not caused him to suffer any pecuniary or emotional harm. *See Gillie v. Law Office of Eric A. Jones, LLC,* Case No. 14-3836 (6th Cir. 2015); *Phillips v. Asset Acceptance, LLC,* 736 F.3d 1076, 1083 (7th Cir.2013); *Miller v. Wolpoff & Abramson, L.L.P.,* 321 F.3d 292, 307 (2d Cir.2003); *Baker v. G.C. Servs. Corp.,* 677 F.2d 775, 780–81 (9th Cir.1982). "Refined to bare essence, the FDCPA bestows upon consumers a right not to receive communications that overshadow or are inconsistent with the validation notice." *See Pollard v. Law Office of Spaulding*, 766 F.3d 98 (1st Cir., 2014); *Tourgeman,* 755 F.3d at 1113–14, 1115, 1116–17 (characterizing analogous right conferred by section 1692e as the right not to be the target of misleading communications).

In *Glazer* the Sixth Circuit held that "filing *any* type of mortgage foreclosure action, even one not seeking a money judgment on the unpaid debt, is debt collection under the Act." *See Glazer v. CHF et al,* 704 F.3d 453, 460 (6th Cir. 2013)(emphasis in the original) The Court has since explained that "filing a complaint may cause actual harm to the debtor: a pending legal action, even pre-service, could be a red flag to the debtor's other creditors and anyone who runs a background or credit check, including landlords and employers. The debt collector may also use the pending legal action to pressure a debtor to pay back the debt informally, without serving the complaint—precisely the type of unfair practice prohibited by the FDCPA" *See Tyler v. DH Capital Mgmt., Inc.*, 736 F.3d 455 (6th Cir. 2013)

Plaintiff is a natural person and a resident of the state of California. (Compl. ¶5; Transcript of the deposition of Lawrence Glazer [hereinafter 'Glazer'] 22:13-21; 24:1-4). No later than 5 May 2008 Plaintiff became the beneficial successor-in-interest to the deceased mortgagor, Charles W. Klie. (Decl: Exh A, pp47-48)

On 5 June 2008 RACJ filed a complaint for foreclosure and named Plaintiff as a defendant. (Exh B) On 25 July 2008 Plaintiff became the distributee of the Estate of Charles W. Klie with respect to the property located at 2498 Bristol Rd. Columbus, OH 43221 and the vested unrestricted title owner of the property. (Decl: Exh C) An amended complaint for foreclosure was filed on 22 August 2008. (Decl: Exh D) Attached to the original and amended complaint were identical copies of the mortgage (standard FNMA form 3036) signed by Deborah and Charles Klie. (Decl: Exh B &D)

The mortgage defines the term "successor in interest" as "any party that has taken title to the Property, whether or not that party has assumed Borrower's obligation under the Note and/or this security interest." (Decl: Exh D, p10) The mortgage and note each contain a standard clause allowing the note holder to declare the debt due in full upon the transfer of "any legal or beneficial interest in the property..." (*Id*. at18-19, para. 18 &22)

The summons (standard form CIV370-S03) served by the court reads: "To the following named defendant: Lawrence R Glazer...If you fail to appear and defend, judgment by default will be rendered against you for the relief demanded in the complaint." (Decl: Exh B, p1)

The original and amended complaint pray for the following relief:

WHEREFORE Plaintiff demands that there be found to be due it the sum of $58,330.28 plus interest at the rate of 5.674% per annum from January 1, 2008; [...] that the Plaintiff be found to have a valid and first lien on said premises for this amount so owing together with its advances made pursuant to the terms of the mortgage for real estate taxes, hazard insurance premiums, and that the premises be ordered [..] sold according to law, and that from the proceeds the Plaintiff be paid the amount found due it. (Decl: Exh B&D)

Attached to the original and amended complaint were identical Notices which state:

If your name appears as a Defendant in this Complaint, the following notice applies to you.
The purpose of the attached document is to collect a debt. [...]
The amount of the debt is stated in paragraph one of the complaint.
The plaintiff as named in this complaint is the creditor to whom the debt is owed.
(Decl: Exh A, p7 & Exh D p.7)

The original and amended complaints for foreclosure state that the "note holder" has "declared [the debt] due". (Decl: Exh B, p3, Exh D, p2 )

The very fact that Defendants filed a two count lawsuit against Plaintiff and pursued legal proceedings to foreclose on the Bristol property while Plaintiff was the sole owner establishes that Plaintiff is "alleged to be liable" on Mr. Klie's debt and thus a "consumer" under the Act.

### B.   The Klie debt is covered by the FDCPA.

The FDCPA defines a "debt" as an obligation "to pay money arising out of a transaction in which the money, property, insurance, or services which are the subject of the transaction are primarily for personal, family, or household purposes, whether or not such obligation has been reduced to judgment." *See* 15 U.S.C. 1692(a)(5). "There could not be a more quintessential personal, family, or household purpose for debt than one incurred in connection with a family home." *See Slenk v. Transworld Sys.*, 236 F.3d 1072, 1075 (9th Cir. 2001); *Wilson v. Draper & Goldberg*, P.L.L.C., 443 F.3d 373, 376 (4th Cir. 2006); *see also Glazer, supra*. An obligation's status as a "debt" under the FDCPA must be determined as of the time the obligation arises. *See Haddad v. Alexander, Zelmanski, Danner & Fioritto, PLLC,* 698 F.3d 290 (6th Cir. 2012). Thus, the purpose for which the debt was incurred at its inception determines the nature of the loan**.** *See Sherlock*, 2008 U.S. Dist. LEXIS 21794, at *12 (2008); *Broadnax v. Greene Credit Service*, 106 F.3d 400, 1997 WL 14777 (6th Cir. 1977) (A transaction's purpose is determined as of the incipience of that obligation, not from what occurred before or after the transaction giving rise to the specific obligation at issue.)

The residential loan application executed by Mr. Klie on 25 August 2003 shows that Mr. Klie stated under penalty of perjury that he was purchasing the Bristol property as his "primary residence." (Decl: Exh E, p1) The mortgage executed by Mr. Klie includes an occupancy clause that requires the borrower to "occupy, establish, and use the Property as Borrower's principal

residence" for at least one year. (Decl: Exh B, pp 14, clause 6) The death certificate included in the preliminary report issued by Nova Title shows that Mr. Klie died at his residence, the Bristol property. (Decl: Exh A, p 44) Plaintiff is a named heir of Mr. Klie. (Decl: Exh A, pp 30-42)

### C. **Defendants are debt collectors.**

Under the FDCPA, a "debt collector" is defined as:

any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts, or who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another. *See* 15 U.S.C. § 1692a(6).

RACJ is a law firm located in Ohio. (Decl: Exh B; ECF Doc. No. 114-6 at para 2) Mr. Chernek, a shareholder of RACJ, described the firm's practice: "We have foreclosure area, Foreclosure Department. We have the Bankruptcy Department. We have a Collections Department. We have an Eviction department." (Chernek 24:23-25:2) In response to discovery requests RACJ stated: "[t]he Reimer Firm generally utilized the U.S. Mail or Federal Express to file documents with the County Recorder's Office." (Decl: Exh F)

Mr. Reimer, a shareholder of RACJ, stated in an affidavit filed with this Court that from 2008 to the present the firm has filed over 5,000 foreclosures on behalf of Chase Home Finance LLC. (ECF #144-7, para 3). Mr. Reimer stated that in the period from June 2008 to June 2009 over 350 such foreclosure actions were filed. *See id.*

Defendant Ronald Chernek Esq., a resident of Ohio, is a lawyer licensed to practice law and a shareholder of RACJ. (ECF Doc. 179 (Chernek 13: 15-18; 24:23-5)) During the relevant period of time he was the head of RACJ's foreclosure department. (ECF Doc. 179 Chernek 25:6-12) Mr. Chernek was the attorney of record in the Klie foreclosure lawsuit: he is identified as the preparer of the bogus assignment of mortgage to CHF, the discovery responses on behalf of CHF, and the two reinstatement letters. (Decl: Exh B, D, F)

Defendant Darryl Gormley Esq., a resident of Ohio, is a lawyer licensed to practice law employed by Defendant RACJ. (ECF Doc. 180 Gormley 9:20-25; 12:2-15:25) Mr. Gormley entered as an attorney of record in the Klie foreclosure lawsuit in 2009, prepared and filed CHF's response to the motion to dismiss, defended CHF's motion for summary judgment, and served the two reinstatement letters on Plaintiff. (Decl: Exh G & H)

**D. Defendants Violated the FDCPA.**

RACJ engaged in a pattern and practice of creating, submitting to courts, and recording documents with false and/or misleading representations in violation of section 1692e(2) &(10) and 1692f. (ECF Doc. 184-86)

**1. RACJ's false representations that the Klie note had been lost are actionable under section 1692e as a misrepresentation of the character and legal status of the debt.**

On 5 June 2008 Defendants filed a complaint for foreclosure against Plaintiff claiming that the whereabouts of the note executed by Mr. Charles W. Klie were unknown and that the note had been lost or misplaced by the maker of the note and CHF. (Decl. Exh B) On 22 August 2008 Defendants filed an amended complaint for foreclosure against Plaintiff and repeated the same representations regarding the whereabouts of the Klie note. (Decl. Exh D)

On 11 June 2008 Defendants prepared and caused Cindy A. Smith to sign a lost note affidavit representing that the original note signed by Mr. Klie had been lost or destroyed; that the note could be accelerated upon default on any installment without further notice to the borrower; and that the mortgage note was assigned to Chase. (Decl. Exh O)

The whereabouts of the Klie note were never unknown. CHF's Rule 35(b) representative testified that CHF was FNMA's designated custodian and had held the original Klie note for the benefit of FNMA since 2007. (Johnson 103:15-104:22) He testified that the note was held in Monroe, LA until it was delivered to Defendants in December 2009. (Johnson 103:15-104:22; 261:17-24)

Defendants made no effort to ascertain the whereabouts of the Klie note prior to preparing and filing the foreclosure complaints and lost note affidavit. (Decl. Exh. F) Further, Mr. Chernek testified that it was the practice of RACJ *not* to verify that the named foreclosure plaintiff ever had physical possession of the original note or that the plaintiff held the original note:

> Q... now, do you have any procedure to verify that the note that the client is sending to you is the copy of the original note that they hold?
> A. [...] if the client tells us this is the copy of the note, an accurate copy of the note, we use that note. We're not at the client's shop, and Ohio is not an original note state, okay, so we rely on what the client tells us. Okay.
> [...]
> Q Now, was there a standard -- was there a procedure for your firm to follow to determine that the copy was a copy from the original note?
> A We didn't have the original note in our possession, so the answer to that would be no.
> Q So my question is: The person who is named as plaintiff in the case does not actually have the original note in their possession, they're not holding that original note, but they have a copy of it, and they send you just the copy, did you have procedure in place in 2008 that will verify that the copy is a copy of the original note?
> A First of all, we have no idea -- the client informs us that this is a valid copy. This is 2008, we accept that that's a valid copy.

(ECF # 179 Chernek 122:4-124:5)

RACJ prepared a lost note affidavit and asserted falsely that diligent efforts had been made to locate the note. (Decl. Exh. F, O); *see also Boyd & Harrison v. Wexler*, 275 F.3d 642 (7th Cir. 2001) (a lawyer-debt collector violates the provisions of the FDCPA by "rubber stamping his clients' demands for payment, thus misrepresenting to the recipients of his dunning letters that a lawyer had made a minimally responsible determination that there was probable cause to believe that the recipient actually owed the amount claimed by the creditor.") Further, despite the language of clause 6(C) of the note, RACJ falsely stated in the lost note affidavit that the note could be accelerated upon default on any installment "without further notice to the borrower."

( Decl Exh. F, O, K)

**2. RACJ's false representations that CHF was the holder of the Klie Note are actionable under section 1692e as a misrepresentation of the character and legal status of the debt.**

Both foreclosure complaints filed against Plaintiff state that CHF is "the holder" of the Klie note. (Exhs B&D.) Mr. Chernek testified that, as used in Count One of the complaint, the term 'holder' means "[t]he entity with authority to enforce the Note." (ECF #179 Chernek 129:9-20) Under Ohio's version of the Uniform Commercial Code, R.C. 1301.01 *et seq*., a "person entitled to enforce" an instrument means any of the following persons: (1) the holder of the instrument; (2) a non-holder in possession of the instrument who has the rights of the holder; (3) a person not in possession of the instrument who is entitled to enforce the instrument pursuant to Section 1303.38 or division (D) of section 1303.58 of the Revised Code. *See* R.C. 1301.31. Under the version of R.C. 1301.01 in effect at the time relevant to this matter, "holder" means either of the following: "(a) if the instrument is payable to bearer, a person who is in possession of the instrument; or "(b) if the instrument is payable to an identified person, the identified person when in possession of the instrument."

Mr. Chernek testified regarding RACJ's process for verifying that the foreclosure plaintiff was in fact the holder of the note:

Q.   So what steps were required in your firm in 2008 to confirm that the Plaintiff can actually have the authority to enforce a lost note?
A We -- first of all, we executed the assignment that we reviewed before and that was recorded --
Q Okay.
A -- and that was the governing document. We wouldn't file a case unless we had an Assignment. [...]
Q. Let's go to the assignment that you signed in the Klie matter.
A Okay.
Q And you see there you are transferring a note from J.P. Morgan to Chase?
A Okay.
Q So, sir, when you prepared this assignment, how did you determine that J.P. Morgan actually held a note signed by Mr. Klie?
MS. BROWN: Objection.

A We -- we didn't have a copy of the note, so we-- I don't know how we would have done it at this time. I don't really know. I don't remember this one.

Q And how would you have gone to confirm that J.P. Morgan has the authority to enforce a note that they may or may not hold?

A We can only look at the mortgage, the title work, and the assignment alleges both, as it is here, but I have nothing in my possession -- we have nothing in our possession.

Q So if there's a mortgage, you assume that the person who is the mortgagee have the note?

A Well, they -- we assert that they're the holder of the note, yes.

Q. But do you verify that factual assertion in any way?

A Other than what the client represents to us, no, because we're not at Chase.

(ECF Doc. #179 Chernek 130:7-132:16)

Defendants knew that FNMA was the owner and holder of the Klie note: the FADIS

referral letter said so. (*see also* Decl Exh. P, p1, L) FNMA's Servicing Guide is equally

clear on the fact that FNMA owned and held the note:

> Fannie Mae is at all times the owner of the mortgage note, whether the note is in our portfolio or whether we own it as trustee for an MBS trust. In addition, Fannie Mae at all times has possession of and is the holder of the mortgage note, except in the limited circumstances expressly described below.
> [...]
> In some jurisdictions, only the "holder" of the note may conduct a foreclosure. In any jurisdiction in which our servicer must be the holder of the note in order to conduct the foreclosure, we temporarily transfer our possession of the note to our servicer, effective automatically and immediately before commencement of the foreclosure proceeding. When we transfer our possession, our servicer becomes the holder of the note during the foreclosure proceedings. If the borrower reinstates the loan or the servicer ceases to service the loan for Fannie Mae for any reason, then possession of the note at that time automatically reverts to Fannie Mae and the note must be returned to the document custodian. At that time, Fannie Mae also resumes being the holder, just as it was before the foreclosure proceedings. The transfer of our possession, and any reversion of possession to us are evidenced and memorialized by our publication of this paragraph. This Guide provision may be relied upon by a court to establish that the servicer conducting the foreclosure proceeding has possession, and is the holder, of the note during the foreclosure proceeding unless the court is otherwise notified by Fannie Mae.
> (Decl. Exhibit L)

RACJ knew, or should have known, about the requirements of R.C. §1301 et seq. and

thus made deliberate misrepresentations about the character and legal status of the debt

they sought to collect. In *Wallace* the Sixth Circuit observed that:

Lerner, Sampson does not dispute that the foreclosure complaint identifies
Washington Mutual as the actual holder of plaintiff's mortgage, but claims
that Ohio law permits Washington Mutual to anticipate that it would become the title
holder after the foreclosure action was initiated but before it becomes final. We
disagree that the issue of standing in Ohio, even if resolved in Lerner, Sampson's
favor, has any bearing on whether misidentifying a creditor is materially
misleading under the Fair Debt Collection Practices Act.

*See Wallace v. Washington Mutual Bank, F.A., & Lerner, Sampson & Rothfuss,* 683 F.3d 323,

387 (6th Cir. 2012) In the footnote following this conclusion, the *Wallace* Court further

explained:

We do not agree, however, with the district courts of this Circuit that have treated the debate
in Ohio over standing to bring a foreclosure action as dispositive of whether a statement was
materially misleading under the Act. [citations omitted] Certainly, should the Ohio courts
decide that Washington Mutual did not have standing to bring the foreclosure action in the
first place, the materiality of the false statement of ownership would be patent. However,
even if Ohio holds the opposite, the Act protects the unsophisticated consumer from false
statements tending to mislead or confuse—whether Washington Mutual may ultimately
succeed in an Ohio court in its foreclosure action has no bearing on whether the initial false
statements misled Wallace. The issue arises in the shadow of the recent subprime mortgage
crises in which financial institutions are charged with encouraging reckless lending
standards and rapid transfer and sale of subprime mortgages so as to profit from the mass
securitization and sale of the mortgages. *See id.*

RACJ may argue that Section VIII, 102 of the FNMA Servicing Guide provides

authority to claim that CHF is a 'holder' regardless of the requirements imposed by R.C.

1301 et seq. Hon. Judge Schack analyzed the fallacy of this argument in *JP Morgan Chase*

*Bank v Butler*:

Ms. Brooks, [Chase's Home Loan Senior Research Specialist] in ¶ 13 of her affidavit,
alleges that the Fannie Mae 2006 Servicing Guide, VIII, 102, "Initiation of
Foreclosure Proceedings [exhibit H of cross-motion]," allows CHASE to be the
plaintiff in the instant action. A reading of this FANNIE MAE regulation demonstrates
the lengths to which FANNIE MAE evaded its responsibility to be the real plaintiff in
interest in the instant action or other foreclosure proceedings. It demonstrates the
"unclean hands" of FANNIE MAE and its servicer, CHASE. It is FANNIE MAE'S
roadmap of how to inveigle and deceive a court.
*See JP Morgan Chase v Butler,* 2013 NY Slip Op 51050, 40 Misc 3d 1205 (July 5, 2013)

As in *Butler*, RACJ never disclosed to the courts or mortgagees that FNMA had concocted a "holder-by-convenience" scheme to fast-track foreclosure filings irrespective of the law. By asserting in court complaints that a foreclosure plaintiff is the 'holder' of the note with full knowledge that no law supports that contention RACJ deliberately misrepresented the character and legal status of the debts it sought to collect.

### 3. RACJ's false representations in the assignments of mortgage are  actionable  under section 1692e as misrepresentations of the character and  legal status of the debt.

The assignment of mortgage filed in the Klie case stated that "FOR VALUABLE CONSIDERATION" the assignor "does hereby sell, transfer, and set over, without recourse, unto Chase Home Finance LLC" the respective "mortgage deed [...] together with the Promissory Note secured thereby and referred to therein, and all sums of money due and to become due thereon." (Decl. Exh. B, p. 25; ECF #184-5) RACJ used this standard language in all assignments of mortgage filed during the relevant period. (*Id*.)

Each assignment was recorded and attached to the foreclosure complaint. In the foreclosure complaint RACJ stated that the foreclosure Plaintiff "is the holder of [the] mortgage deed [...] and has been assigned to Plaintiff as evidenced by the assignment of mortgage, a copy of which is attached hereto and marked as EXHIBIT [..]; that said mortgage is a valid and first lien upon said premises." (Decl. Exh. B, p. 4; ECF #184-85)

RACJ knew that those representations of fact were false.

Mr. Chernek testified that as an assistant secretary of MERS he "was assigned to review assignments, to make sure that they were accurate." (ECF #179 Chernek 18:22-24) To verify the accuracy of the factual assertions in the assignments Mr. Chernek reviewed only the "title report and the documents attached to the title report" which comprised only documents recorded with the recorder's office and documents in the public domain. (ECF 179 Chernek 19:22-23)(Decl.Exh. A, Y)

Mr. Chernek testified in detail regarding RACJ's "policy and procedure" for verifying the accuracy of assignments of mortgage:

> Q: So in this particular [Klie] assignment...it says that, "For valuable consideration, the receipt and sufficiency of which is hereby acknowledged J.P. Chase Bank...does hereby sell, transfer, and set over, without recourse unto Chase Home Finance," a mortgage which is identified in the next block, "together with a Promissory Note secured thereby and referred therein, and all sums of money due and to become due thereon."
> So can you tell me, first, what document in a title report will you review to determine that valuable consideration has been paid and received by Chase Home Finance?
> MS. BROWN: Objection.
> A There's no -- nothing in the title report that indicates that.
> Q Okay. How would you verify the accuracy of that particular statement?
> A That statement is in the verbiage of all transfers of property in Ohio.
> Q I understand that.
> A So --
> Q My question is: You said somebody prepared this document and you verify that -- you review it, I believe that's what you said, correct?
> A Correct.
> Q And when we talked to the first one that I introduced, you said you verify it for accuracy. When you review this particular assignment, do you review it for accuracy?
> A Yes.
> Q Okay. So did you review the accuracy of the statement that "valuable consideration has been received" by Chase Home Finance?
> A  Again, that's something that is in transfers of title; and so, I felt no need to review that particular statement for accuracy. So I guess the answer is no.
> Q Okay. Now, you said that it's required for all assignments for mortgage in Ohio, so for any assignment that you have prepared, or that your name appears "prepared by," would you have done anything different in order to verify the accuracy of the statement that is included in all these assignments?
> A No.
> Q No, okay. Now, I'm asking you to look at the area that says the transfer covers the "Promissory Note secured thereby and referred to therein"?
> A Correct.
> Q Now, sir, what information in the title report is there to allow you to verify the accuracy of that transfer?
> A There's nothing in the title report.
> Q Okay. So, what document, database or information did you review to determine the accuracy of the fact that J.P. Morgan transferred to Chase Home Finance a Promissory Note?
> A There's nothing to review at this point, it just -- we know that there's also a Promissory Note and that -- there should be a Promissory Note and that we are transferring that along with the mortgage.
> Q You say "we," meaning your firm is transferring it with the mortgage?
> A No, no.
> Q Who are "we"? You said we.

A J.P. Morgan Chase Bank, NA, transferring to Chase Home Finance, LLC.

Q Now, my question was: How did you determine that this transfer actually occurred in this particular case? Or did you confirm the accuracy of that statement?

A We are just stating that that is happening with this document, so that has not happened yet.We are just stating that that is being transferred.

Q Okay. So the note will be transferred after this document?

MS. BROWN: Objection.

MS. GLAZER: Well, Counsel, I'm trying to find out what Mr. Chernek said. If I misunderstand the testimony, I think it will be good for everybody to figure out what is said or what is intended to be said.

Q So my question is: Is the note that is identified in this document, already transferred for buyer consideration from J.P. Morgan to Chase Home Finance?

A No.

Q So you prepared this document, this document is executed, it is recorded, and then at what point is the note actually transferred to Chase Home Finance or the receiving entity?

A First of all, I'm -- back up a second.

Q Sure.

A I -- I have no way of knowing what Chase has done.

Q Okay.

A I don't work at Chase, okay?

Q Fair enough.

A So -- but we seek to have the note transferred with the mortgage --

Q I understand.

A -- by this document.

Q I understand. I understand what you're trying to say. My question is: When you prepared this document and that information -- this document is put into a paper format, I want to make sure that I understand, at that time no note has been transferred yet to the receiving entity, in this case the assignees.

MS. BROWN: Objection, he just indicated he didn't know.

MS. GLAZER: I want to make sure I understand the question and answer given.

[...]

Q So you don't know if a transfer of note has occurred?

A I do not.

Q Okay. Now, since you said assignment of mortgages are a standard document -- now, for any document that was prepared and it says, "prepared by Ronald Chernek," would that be a fair statement, that you did not know whether the note was transferred or not?

A First of all, I said this was -- appears to be something off a template. I'm not saying that all assignments of mortgage are off a template --

Q That you prepared?

A -- so I'm not even sure of that.

[...]

Q My question is: When you, as the preparing entity, you go in to prepare an Assignment of Mortgage, you said there's some verbiage that is required by Ohio law. If the Assignment of Mortgage will say that the note has been transferred, you personally, did you have a way to verify that that transfer had already occurred?

A No, I mean -- no.

Q No?
A No.
[...]
My question, then, is: When you go in to prepare an Assignment of Mortgage and the Assignment of Mortgage will be saying that an assignment of a Promissory Note is being accomplished with the transfer, how did you verify the accuracy of that information?
MS. BROWN: Objection.
A There's nothing to verify. I'm just stating that with this document that that Promissory Note is being transferred.
Q At the time when you put down that information,you're not saying the Promissory Note was already transferred?
A I'm not saying that, no.
Q And you do not know whether, in fact, the Promissory Note will be transferred after you have said it in the process of being transferred?
MS. BROWN: Objection.
A This document seeks to do that.
Q Okay. And so, how is this document accomplishing the transfer of the note?
A Because it is recorded and it is stated on the face of the document that that's happening. That was the policy and procedure.
(ECF Doc. #179 Chernek 66:24-77:10)

RACJ's pattern and practice of misrepresenting material facts in mortgage assignments was concealed from the courts, the public, and mortgagees. Countless courts in Ohio took the false statements in RACJ's assignments at face value and ruled time and again that the plaintiff named in the foreclosure complaint had standing and the right to enforce the note and mortgage as "a holder" solely on the basis of RACJ's bogus assignments. *See, e.g*, *M & T Bank v. Steel*, 2015-Ohio-1036; *Nationstar Mtge., L.L.C. v. West*, 2014-Ohio-735; *BAC Home Loans Servicing, L.P. v. Hall*, 2010-Ohio-3472, ¶ 5-25.

As illustrated by the Klie case, after Coldwell Banker sold, assigned, and transferred the Klie note and mortgage to FNMA in 2003, Coldwell Banker had nothing to convey to JP Morgan in 2007. After 3 September 2003 only FNMA was able to sell, transfer, or assign the note and mortgage. Any purported attempt by RACJ to do so on behalf of any other entity conveys nothing to the recipient and is invalid on its face. (Decl. Exh B, D, I, J, K, AF)

**4. RACJ's false representations in the FDCPA notices attached to the foreclosure complaints are actionable under section 1692e as a misrepresentation of the character and legal status of the debt.**

Defendants attached to the Klie foreclosure complaint and amended complaint an FDCPA notice in which they asserted that CHF is the creditor to whom the debt is owed despite knowing that FNMA owned the debt, note, and mortgage since 3 September 2003. (Decl. Exh B p.7, Exh D p.7, Exh I, J, L, ECF #184-5) By misrepresenting the name of the actual creditor and withholding FNMA's interest in the loan, note, and mortgage RACJ made deliberately false representations about the legal status and character of the debt.

**5. RACJ's failure to identify FNMA's interest in the loan, note, and mortgage is a misleading and/or deceptive means in violation of 1692e(10).**

Although the FDCPA does not define the terms "deceptive" and "misleading" courts have given those terms their ordinary meaning: "giving an impression different from the true one." *See Hagler v. Credit World Servs., Inc.* (D. Kan.2014)  Here, RACJ deliberately withheld (1) the identity of the true creditor, FNMA; (2) the representative capacity in which CHF attempted to collect FNMA's debts; and (3) the fact that CHF did not receive an assignment of the debt for value to allow it to collect in its own name as an assignee per R.C. 1319.12. *See* R C. §1319.12; *see also* R C. §2921.13.

RACJ's deceptions were material: they prevented mortgagees from contacting the true creditor, disputing the debt asserted, obtaining validation of the debt, insisting on compliance with the procedural requirements in the FNMA Servicing Guides, and formulating a defense to RACJ's foreclosure complaints.

**6. RACJ violated the FDCPA by collecting or attempting to collect unauthorized and unearned fees.**

Section 1692e(2)(B) prohibits a debt collector from falsely representing "any services rendered or compensation which may be lawfully received by any debt collector for the

collection of a debt." Section 1692f provides that a debt collector may not use unfair or unconscionable means to collect or attempt to collect any debt, including, without limitation, collecting "any amount (including any interest, fee, charge, or expense incidental to the principal obligation) unless such amount is expressly authorized by the agreement creating the debt or permitted by law." *See Edwards v. McCormick*, 136 F. Supp.2d 795, 806 (S.D. Ohio 2001) (quoting *Adams v. Law Offices of Stuckert & Yates*, 926 F.Supp. 521, 528 (E.D. Pa. 1996))

The costs and fees charged by RACJ while conducting foreclosures are governed by the mortgage documents, RACJ's agreements with CHF and FNMA, FNMA guidelines, and state and federal law. The mortgage covenants provide that when a borrower is in default the lender can advance money for reasonable attorney fees to protect its interest in the property, reasonable costs to secure and preserve the property, and fees for services performed in connection with the borrower's default. (Decl. Exh B, pp.8 et seq., ECF #184-85) The mortgage instrument specifies that any amount "disbursed by lender under section 9 shall become additional debt of Borrower secured by the security instrument." (*Id.*)

RACJ entered into an agreement with FNMA and CHF to perform management of FNMA owned loans for a maximum fee of $1,100 for routine foreclosures until 1 October 2008 and for a maximum fee of $1,350 thereafter. (Decl. Exh M-1, Exh R, Exh. U) The maximum allowable fee set by FNMA is intended to compensate the law firm for all legal work required to complete a routine foreclosure. The fee includes document preparation and case review, ordering title and title review, drafting pleadings, coordination of postings and court filings, court appearances, conducting the sale of the property, and firm overhead. (Decl Exh U)

The FORTRACS history notes show that on 21 May 2008 Joanna May emailed to RACJ a reinstatement quote in the amount of $3,294.30. (Decl. Q, R)[1] RACJ added $1,744.25 in fees and costs to this sum and attached to its cover letter sent to the deceased Mr. Klie a document attributed to CHF and titled "reinstatement quote" requesting $5,038.55. (Decl. Exh P, pp.9-12)

---

[1] RACJ has not produced the 5/21/2008 email.

The FORTRACS notes show that on 30 June 2008 Claudia Menacho emailed to RACJ a reinstatement amount due of $3,941.36; RACJ, in turn, added $1,894.25 and prepared a reinstatement quote for $5,835.81. *Id*. At the time it issued the reinstatement quotes RACJ knew that CHF would add these sums to the debt on the Klie loan per section 9 of the mortgage instrument. (Decl Exh P pp 9-12; Exh G, Exh S)

RACJ's reinstatement quotes sought to collect unauthorized, inflated, and/or unearned fees.

*First*, Mr. Klie's monthly mortgage payment was $628.69. (Decl. Exh. S) Mr. Klie was current on his loan at the time of his death on 31 January 2008. *Id*. Yet, the May quote falsely represents that nonpayment from an unknown date until 1 February 2008, the day after Mr. Klie died, resulted in a "BALANCE OF ALL ACCUMULATED PAYMENTS DUE" of $5,038.55. (Exh. P. p7) In the June quote Defendants claimed that the "BALANCE OF ALL ACCUMULATED PAYMENTS DUE FROM 2/1/2008 TO 3/1/2008" is $5,835.61. (Exh P p.9-10).

*Second,* CHF assessed $14.00 for a delinquency inspection on 27 March 2008 and $15.00 for a second inspection on 23 April 2008. (Decl. Exh. S) Safeguard did not conduct another inspection until 30 May 2008; the fee for that inspection was added to the Klie loan on 3 July 2008. Both the May and June reinstatement quotes sought a fee of $59.00 for property inspection/maintenance. (Decl. Exh. P)    According to their own admissions Defendants inflated the inspection fees in the May and June reinstatement quotes by $30.00. Either Defendants included fees for future services or added fees not yet authorized by CHF. Regardless, either practice is unfair and prohibited under the FDCPA.

*Third*, Defendants hid attorney fees in the reinstatement quotes under the designation "BKR/FCL EXPENSES" and sought to collect unearned, inflated fees:

**INTERROGATORY No. 12**

State the breakdown by category and amount of all charges and fees comprizing the amount of $1,744.25 for "BKR/FCL expenses from referral date of 5/16/2008" as stated in the 21 May 2008 reinstatement quote addressed to Mr. Charles W Klie.

**ANSWER:**  Objection.  This request is overbroad and not calculated to lead to the discovery of admissible evidence.  Without waiving said objection:  1.  $674.25 for title commitment and exam fee; 2.  $300.00 for complaint filing fee; and 3.  $770.00 for attorney's fees.

**INTERROGATORY No. 13**

State the breakdown by category and amount of all charges and fees comprising the amount of $1,944.25 for "BKR/FCL expenses from referral date of 5/16/2008" as stated in the 30 June 2008 reinstatement quote addressed to Mr. Charles W Robert Morrow Esq.

**ANSWER:**  Objection.  This request is overbroad and not calculated to lead to the discovery of admissible evidence.  Further, the amount reflected in the quote is $1,894.25, not $1,944.25. Without waiving said objection:  1.  $674.25 for title commitment and exam fee; 2.  $300.00 for complaint filing fee; 3.  $770.00 for attorney's fees; and 4.  $150.00 for final judicial report and exam fee.

Defendants admit that they sought to collect attorney fees masquerading as "BKR/FCL EXPENSES". The designation "BKR/FCL EXPENSES" is misleading and conceals the fact that RACJ sought to collect 70% of the maximum allowable FNMA attorney fees three days after receiving the referral. (Decl. Exh R, U) Further, an invoice produced by Defendants shows that CHF had paid only $550.00 in attorney fees to Defendants in 2008. (Dec. Exh P, Exh S at bates 0000219 reflecting that on 23 June 2008 the amount of $850.00 [representing $550 (atty fees) +$300 (court filing fees)] had been added by CHF to the balance of the Klie loan.) In the reinstatement quotes Defendants inflated their attorney fees by $220.00. *See Id*.

*Fourth*, in the 21 May 2008 quote RACJ sought to collect late fees for the months of February, March, April, May, and June in the sum of $18.37 per month. The June payment would, however, not have been subject to a late fee under the terms of the note until after 15 June 2008. Similarly, in the 30 June 2008 quote RACJ sought to collect late fees for July. In both reinstatement quotes RACJ inflated the late fees by $18.37.

*Fifth*, in the 21 May 2008 quote RACJ sought to collect five months of accumulated due payments. (Decl. Exh. P) And yet, on the date of the quote, the June payment was not yet due and could not have been accumulated. Similarly, in the June quote Defendants represented that the July payment had been accumulated and payment was due. In both reinstatement quotes RACJ inflated the accumulated monthly payments due by $628.69.

*Sixth*, on 21 May 2008 Defendants sought to collect $674.25 for "title commitment and exam fee". (Decl. Exh. X)   And yet, the invoice from Nova Title to RACJ was dated 27 May 2008 and RACJ received the title commitment on 28 May 2008. (Decl. Exh P pp 4-5, Exh R p14, Exh Y) Defendants thus sought to collect $674.25 in fees for future services.

*Seventh*, Defendants sought to collect $150 for a final judicial report -- a report not even ordered until 31 July 2008, the day after the expiration of the June reinstatement quote. *Id*.

All of the above are violations of the FDCPA: "'A debt collector that inflates the amount of the debt, whether through unauthorized service fees or otherwise, violates [section 1692e(2)(A)].'" *See Gathuru v. Credit Control Services, Inc.*, 623 F.Supp.2d 113, 122 (D.Mass. 2009) (collecting cases); *McLaughlin v. Phelan Hallinan & Schmeig, LLP,*, 2014 U.S. App. LEXIS 12028 (3d. Cir. June 26, 2014). (Debt collectors may not, consistent with §1692e, represent estimates of the amount that the debtor would ultimately owe as the actual amount owed as of the date of the communication); *Kaymark v. Bank of America*, N.A.,783 F.3d 168(3d Cir. 2015).

**7.  RACJ inflated fees and double billed for title work by creating and 'hiring' Nova Title to provide preliminary, subsequent, and final judicial reports for all of its foreclosure cases.**

RACJ's agreements with CHF and FNMA, as well as the applicable guidelines, distinguish between the maximum allowable *legal fee* for work performed on foreclosure cases and

allowable *costs* incurred by the law firm in prosecuting the foreclosure. (Decl. Exh M-1, M-2, U) The agreements make clear that costs incurred by the law firm and passed along to the servicer/investor and ultimately added to the borrower's debt must be actually incurred, necessary to complete the foreclosure, and reasonable.

RACJ admits that, for the Klie case and for all CHF foreclosures during the period from 2 June 2008 through 22 July 2009, RACJ used Nova Title to provide all preliminary, subsequent, and final judicial reports. (Decl. Exh F) In every foreclosure case RACJ filed with the court an invoice for title reports in which it charged as court costs the premium for a title commitment and the following "exam fees": $335.00 for a preliminary report and $100.00 for subsequent reports. (Decl Exh H, Exh. V, W)

As shown by the two reinstatement quotes in the Klie case, even if a borrower wished to reinstate the loan the borrower would still be assessed the fee for the unnecessary final judicial report. (Decl. Exh.P) Further, since the preliminary judicial report never results in a policy, Nova Title, as the agent, retains the premiums charged.

RACJ did not disclose to the court and foreclosure defendants that Nova Title kept 85-90% of the amounts charged as a 'premium'. *See* http://www.naic.org/cipr_newsletter_archive/vol4_title_insurance.htm. Moreover, Nova Title did not produce the actual title reports from its vendor; instead, Nova Title purchased the reports from a third party vendor, printed them using the Nova Title letterhead, and then pocketed the fees in excess of the actual costs of the reports. (Decl Exh A, V.,X, Y)

RACJ uses these title reports to prepare foreclosure complaints and bogus assignments of mortgage. (ECF Doc. 179) Since the firm is compensated for legal work pertaining to ordering title and performing title examinations as part of the FNMA flat fee, RACJ essentially uses Nova Title to print an insured title product purchased from an unaffiliated entity on pre-printed forms provided by First American Title Co. (Dec. Exh U, Y) The practice is fraudulent, misleading, and deceptive: the same entity that collects the debt self-insures its own work using a different name.

The practice is especially egregious since neither the legal filings under the name of RACJ nor the title insurance report filed under the name of Nova Title discloses FNMA's interest in the loan, note, and mortgage.

Why, at the expense of struggling Ohio homeowners, would RACJ participate in a scheme to enrich Nova Title? Because the shareholders of RACJ own Nova Title. (Decl. Exh Z) At no time did RACJ disclose to the courts or the public that Nova Title shares its physical location, employees, and access to computers and data with RACJ. *See Response to Motion to Disqualify Counsel at II.*

According to the Ohio Department of Insurance, on 27 June 2000 RACJ attorney Michael Lorber filed an application for Non-Resident License/Registration in which he attested that the shareholders and directors of Nova Title Agency Inc. are (1) Michael Lorber, 50% owner, (2) Denis Reimer; 30% owner (3) Adam Gross, 10% owner, and (4) Michael Arnovitz, 10% owner. (Exh Z page 14, 18). In the same application Mr. Lorber explains that "owners of title agency are all members of Denis Reimer Co. LPA" (Decl. Exh Z p 18). A 2012 document titled "electronic resident licensing renewal" deleted Mr. Reimer as an employee of Nova Title Agency while identifying Mr. Lorber as the president of Nova Title, Mr. Dyer as the vice president, and Mr. Arnovitz as the secretary and treasurer. *See* ECF Doc No. 169. [notice of related cases]

ODI records show that Mr. Haessig is a licensed agent for Nova Title and one of the two RACJ attorneys responsible for reviewing and signing all foreclosure complaints during the period from June 2008 to June 2009. (Decl Exh Z p 3) Mr. Reimer, deleted as an "employee" of Nova Title in 2012, remains a title agent for Nova Title. *(Id.* pp. 7-8) Mr. Reimer explained to the ODI: "I derive compensation and am employed by the law firm of Reimer Arnovitz Chernek & Jeffreys LPA of which I am the senior partner." (*Id.*) Mr. Arnovitz is identified as an owner and secretary of Nova Title. (Exb. Z pp 9, 13, 18) He is also the managing partner of RACJ. Mr. John James Dyer is identified as an owner, 'RDA', Vice President, and Treasurer for Nova Title. *See* ECF Doc No. 169. The Ohio Supreme Court, Attorney Registration Commission, lists Mr. Dyer

as an attorney employed by RACJ. *See* Exhibit Z. Mr. Lorber is identified in the ODI database as an employee and president of Nova Title since 1999.The Attorney Registration Commission identifies Mr. Lorber as an attorney with RACJ. *See* ECF Doc No. 169

**8.  RACJ violated section 1692g by continuing collection efforts without validating the debt.**

If a consumer notifies the debt collector in writing within thirty days of receiving the §1692g(a) notice that he disputes the debt or any portion of it, the debt collector must stop collecting the debt, or the disputed portion of the debt, and obtain verification of it and mail that verification to the consumer. *See* 15 U.S.C. §1692g(b).

On 7 July 2008 Plaintiff's counsel notified RACJ and Mr. Chernek that Mr. Glazer was "disputing the validity of the debt stated in count 1 of the complaint" (Decl. Exh P, pp 16-18). The dispute notice requested "a copy of the preliminary report, and the mortgage payment history ledger." (*Id*). On 16 July 2008 Mr. Chernek responded as follows: "While I cannot provide you with a copy of the payment history [...] I have attached a copy of the Title Commitment, which replaces PJR in Franklin County. In order for me to provide you with more information, you (or a licensed attorney if you are not a member of the Ohio bar) would need to enter an appearance into the case and serve a request for production of these documents." (Decl. Exh. A)

The *Haddad* Court addressed the meaning of "verification" under §1692g(b) and ruled that "the verification provision must be interpreted to provide the consumer with notice of how and when the debt was originally incurred or other sufficient notice from which the consumer could sufficiently dispute the payment obligation." *See Haddad v. Alexander, Zelmanski, Danner & Fioritto, PLLC*, --- F. 3d --- (6th Cir. 2014), 2014 WL 3440174 (6th Cir. 2014). Mr. Chernek acknowledged during his deposition that the title report provides no information about the validity of the debt stated in count 1 of the foreclosure complaint. (ECF #179 Chernek 69: 21-22:9; 71:8-25) Defendant's admission shows that the "verification" provided was inadequate:

verification of the Klie debt under *Haddad* requires that RACJ disclose FNMA's ownership of the debt and provide "an itemized accounting detailing the transaction in an account that has led to the debt." *Id*. Despite its willful, deliberate failure to validate the debt RACJ continued with its debt collection activities. (Decl. Exh D, G, H)

**9.  RACJ violated section 1692d and 1692f by Advertising the property for a sheriff sale without a decree of foreclosure and directing Safeguard to enter and disable the property without a present right of possession.**

15 U.SC §1692d prohibits debt collectors from engaging in conduct the natural consequence of which is to harass, oppress, or abuse a person, including but not limited to using or threatening to use force or other criminal means to harm the reputation and property of a person.

Defendants had contractual obligations with both FNMA and Chase to oversee all aspects of the foreclosure process and to make sure that all actions taken to collect debts in default were in compliance with the mortgage instruments and applicable laws. (Decl. Exh M-2 p.13, Exh U pp 6-7) Defendants knew that section 7 of the mortgage instrument allows a lender and its agents to inspect the interior of a property only upon prior notice and upon reasonable cause. (Decl. Exh B & D at p.14) According to FNMA requirements Defendants were also responsible for "conducting, or arranging for sheriff or other third party to conduct, the foreclosure sale." (Decl. Exh U, *Id*. at pp.6-7) Defendants also knew that FNMA requires that a "comprehensive inspection" be performed 30 days before a foreclosure sale. (Decl. Exh T) During a comprehensive inspection FNMA requires that the occupancy be confirmed and the condition of the property be evaluated to ascertain the need for any repairs to make the property "marketable". (Decl Exh T)

Defendants knew that Safeguard had been hired by CHF to perform property inspections and debtor interviews in the Klie matter. (Decl Exh P pp 6-10, Exh AC) In fact, as shown above, RACJ attempted to collect amounts for Safeguard's past and anticipated inspections. *See id*.

RACJ's Perfect Practice notes show that on 22 December 2008 RACJ ordered a sale of the Bristol property and obtained a decree of foreclosure. (Dec. Exh R, RL000083 Exh H).

On 7 January 2009 Hon. Judge Fais granted the undersigned's motion and vacated the decree of foreclosure. (Decl. Exh H) Despite a note in their internal system that the judgment of foreclosure had been vacated RACJ continued to advertise the property for sale and did not move to withdraw the sale until 2 March 2009. (Exh. R, RL000073)

On 12 March 2009 RACJ requested "occupancy status" on the Bristol property. (*Id*.) In response to RACJ's request, on 25 March 2009 Safeguard initiated a 'contact attempt', determined that the property was vacant, and bid to do 'repairs'. (Decl. Exh AC p. 6-9). On 6 April 2009 a Safeguard contractor returned to the Bristol property to winterize it. (Id., SAFEGRD000039) The contractor noted that the property was occupied, the utilities were on, and observed "personals in house in boxes, dishwasher, and other boxes I cannot identify No work done." *Id*. On 15 April 2009 and 16 April 2009 "late rush orders" were placed by a "Title Inspection Support Coordinator" to change the locks, place a lockbox, winterize, and cut the grass. *Id.* Accordingly, on 21 April 2009, Safeguard, at the direction of Defendants and their employees, subcontractors, and/or agents, reentered the Bristol property, winterized the bathroom, changed the lock on the side door, placed a combination lockbox on the front door, and shut off utilities. (Dec. Exh AC) During the unauthorized entry the floors, furnace, and other fixtures were damaged, and personal property belonging to Plaintiff and Mr. Klie's estate was sifted through and moved. (Dec. Exh AC) All acts were done in anticipation of preparing the Bristol property for a sheriff sale despite there being no decree of foreclosure.

On 26 April 2009 Plaintiff's counsel again notified Defendants and their agents that they lacked the authority to enter the Bristol property. (Decl. Exh P) Safeguard reentered the property on 22 June 2009. (Exh. P, AC, SAFEGRD 000123, AD)

At all times Defendants knew that no notice had been given to Plaintiff prior to entry into his property. Defendants knew that Plaintiff had not given consent to enter his property. (Decl.

Exh AD) Defendants knew that their request for 'occupancy determination' would cause Safeguard to enter the Bristol property and disable the property without a present right of possession. The natural consequence of Defendants' actions was to harass, oppress, or abuse a person in connection with the collection of a debt. *See* 15 USC 1692d.

**CONCLUSION**

Plaintiff respectfully requests that the Court grant Plaintiff's motion and rule that Defendants have violated section 1692d, 1692e, 1692f, and 1692g of the FDCPA. Plaintiff respectfully requests that the Court order a jury trial on the issue of damages.

Respectfully Submitted by

__*s/ Nicolette Glazer*_____
Nicolette Glazer Esq. CSB 209713
LAW OFFICES OF LARRY R GLAZER
1875 Century Park East #700
Century City, CA 90067
Tel: (310) 407-5353
Fax: (310) 407-5354
nicolette@glazerandglazer.com

**LOCAL RULE 7.1(f) CERTIFICATION**

Pursuant to Local Rule 7.1(f) the undersigned certifies that this case has not yet been assigned a track and is therefore proceeding as an unassigned case at this time. The Memorandum of Points and Authorities filed in support of this Motion for Summary Judgment on the issue of liability under the FDCPA is within the page limitation authorized by the Court (ECF Docket dated 7-1-2015).

_____*s/ Nicolette Glazer Esq.*_____
Nicolette Glazer CA Bar #209713
ATTORNEY FOR PLAINTIFF

## CERTIFICATE OF SERVICE

I hereby certify that on 1 July 2015 I electronically transmitted the
attached document to the Clerk's Office using the CM/ECF system for filing and
transmittal of a Notice of Electronic Filing to all parties' registrants by operation of the Court's
electronic filing system.

DATED:      1 July 2015


_____*s/ Nicolette Glazer Esq.*_____
Nicolette Glazer CA Bar #209713
ATTORNEY FOR PLAINTIFF