Page 1

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO - EASTERN DIVISION

LAWRENCE R. GLAZER,
etc.,

        Plaintiff,      JUDGE BOYKO
                      MAGISTRATE WHITE
  -vs-              CASE 1:09-CV-01262

CHASE HOME FINANCE, LLC,
et al.,

        Defendants.

- - - -

CONTAINS CONFIDENTIAL TESTIMONY

- - - -

  Videotaped deposition of LARRY R. GLAZER, ESQ.,
taken as if upon cross-examination before
Colleen M. Malone, a Notary Public within and for
the State of Ohio, at the offices of Gallagher
Sharp, Sixth Floor Bulkley Building, 1501 Euclid
Avenue, Cleveland, Ohio, at 9:06 a.m. on
Thursday, September 11, 2014, pursuant to notice
and/or stipulations of counsel, on behalf of the
Defendants in this cause.

- - - -

MAGNA LEGAL SERVICES
(866)624-6221
www.MagnaLS.com





EXHIBIT

tabbies®

C

Page 89

1    Q.  I'm not asking for your legal opinion.

2    A.  -- a personal.  Okay.  I was, I was about to say

3        if you're asking for my --

4    Q.  Okay.

5    A.  -- personal observations --

6    Q.  Okay.  Yes.

7    A.  -- a percipient witness to --

8    Q.  No, I'm asking what you know that Mr. Chernek did

9        with respect to your allegation that he used

10       force or other criminal means to harm your

11       reputation and the property.

12              MS. GLAZER:  Objection.  And also

13           to ask "what do you know" goes into

14           privilege, so I'm directing the witness

15           anything that comes to communication from

16           counsel or with counsel not to answer.

17              MS. BROWN:  Are you instructing

18           him not to answer this question?

19              MS. GLAZER:  If it goes to

20           communication.  Your question was I want to

21           know -- he asked you:  Are you asking me

22           for my percipient witness --

23              MS. BROWN:  I don't need a

24           speaking objection.  Are you instruct --

25              MS. GLAZER:  Ma'am.



Page 90

```
 1                    MS. BROWN:  No.  I'm not, I'm not
 2            asking for a speaking objection.
 3                    Are you instructing him not to
 4            answer?
 5                    MS. GLAZER:  I am going to repeat.
 6                    MS. BROWN:  I --
 7                    MS. GLAZER:  When it is going to a
 8            privilege, I'm going to make it for the
 9            record.
10                    MS. BROWN:  You already stated.
11                    MS. GLAZER:  If you're asking, you
12            said, you're asking for your knowledge in
13            response to the witness stating are you
14            asking for my personal knowledge as a
15            percipient witness.  To the extent that you
16            meant knowledge to include communications
17            from counsel, I am directing the witness
18            not to answer with respect to anything that
19            goes into communication, privileged
20            communication with counsel.
21  Q.  Can you answer the question?
22                    MS. GLAZER:  With that, please
23            respond.
24  A.   I, I am not going to assess the state of the
25       evidence.  However, if, if what you are asking me
```



Page 91

```
 1        is whether I personally saw Mr. Chernek break in
 2        to the Bristol Road property, the answer is no.
 3   Q.   I haven't gotten to there, but that will be my
 4        next question.
 5            Paragraph 80 -- 82 states:  Specifically, on
 6        April 21st, 2009, defendants and their employees
 7        committed an unlawful breaking and entering into
 8        the residence located at Bristol Road.
 9   A.   Uh-huh.
10   Q.   And I'm paraphrasing.
11            You have no knowledge, personal knowledge of
12        Mr. Chernek breaking or entering into the Bristol
13        Road property, correct?
14                  MS. GLAZER:  Objection.
15   A.   Can't ans --
16   Q.   Is that a yes or no?
17   A.   Can't answer that question as phrased.
18   Q.   Okay.
19   A.   You're asking for personal knowledge.
20   Q.   Do you have any evidence, do you know of any
21        evidence that Mr. Chernek broke or entered into
22        the residence at, the Bristol Road residence?
23                  MS. GLAZER:  Objection.
24   A.   If you're asking whether I know of any evidence
25        that Mr. Chernek drove down from the Cleveland
```



Page 92

```
 1          area to Upper Arlington and physically broke into
 2          the Bristol Road property, no.  I have no -- I
 3          know of no evidence that Mr. Chernek personally
 4          broke into the house.
 5     Q.   Okay.  Do you know of any evidence of whether
 6          Mr. Gormley broke or entered into the Bristol
 7          Road property?
 8                    MS. GLAZER:  Objection.
 9     A.   Again, if you're asking for my -- I can state
10          with certainty I am not a witness to any of your
11          clients, your -- any attorneys breaking into the
12          Bristol Road property.
13              If you're asking for the state of the
14          evidence, well, I won't -- I can't -- I'm not
15          here to assess it and I don't know all the
16          evidence in the case.  I, I will -- I, I can say
17          that I personally do not know of any evidence to
18          that effect.
19     Q.   Okay.  Then why did you make that allegation in
20          your complaint?
21                    MS. GLAZER:  Objection.
22     Q.   You've alleged that my clients broke and entered
23          into that property; that they winterized the
24          bathroom; they damaged the floor; they damaged
25          the furnace and other fixtures.
```



Page 100

1               MS. GLAZER:  Is there a question?

2   Q.  So what's the evidence, what evidence are you

3       aware of that the Reimer firm directed Safeguard

4       to enter into the property?

5               MS. GLAZER:  Objection.  And to

6               the extent that, as phrased, the question

7               calls for communication with counsel, the

8               witness is directed not to divulge

9               confidential attorney/client

10              communications.

11              Other than that, please go ahead

12              and answer.

13  A.  Can you please restate your question?

14              MS. BROWN:  Can you restate the

15              question, please.

16                  -   -   -   -

17              (Thereupon, the requested portion of

18              the record was read by the Notary.)

19                  -   -   -   -

20              MS. GLAZER:  Same objection.  Just

21              carry over.

22  A.  If -- honestly, counselor, I'm not sure what

23      you're asking me to do other than assess the

24      state of the evidence, so maybe I'm missing what

25      you're --



Page 112

```
 1        while I wasn't a witness to anything, I do recall
 2        reviewing your interrogatories, I believe, that
 3        Nicolette answered, and I, I think, to the best
 4        of my recollection, that Nicolette identified
 5        evidence in, in one of those, in one of your
 6        interrogatories that bear on that question.
 7   Q.   Okay.
 8   A.   So I would direct you to that too, if my
 9        recollection is correct.
10   Q.   Okay.  Let's look at -- well, let's look back at
11        paragraph 82.
12   A.   Uh-huh.
13   Q.   And you state it's your understanding Safeguard
14        is the entity that, that entered the property,
15        correct?
16   A.   Correct.
17   Q.   And you state they "...'winterized' the
18        bathroom...".
19            What did you mean by that?
20   A.   It's in quotes.  I, I believe, if I recall
21        correctly, there was something left by Safeguard
22        indicating that it had been winterized.
23   Q.   Okay.
24   A.   That's, that's my recollection, but I'm ...
25   Q.   Was there any damage to the bathroom due to this
```



Page 113

```
 1      winter -- it being winterized?
 2   A. There was, absolutely.
 3   Q. What damage was done?
 4   A. Uhm.  What I recall --
 5   Q. Uh-huh.
 6   A. -- is that their contractor said there was some,
 7      there was damage that involved, involved piping
 8      and -- I, I, I don't remember what specifically
 9      the, the -- there was.
10   Q. Okay.
11   A. Uhm.  Uhm.  But I recall the contractor telling,
12      telling us -- trying to explain to, uhm, to me,
13      not terribly savvy about plumbing issues and
14      pipes and what, what had happened there and I
15      think connectors to pipes and that sort of
16      thing --
17   Q. What was the damage that was done to the
18      bathroom, though.
19   A. Well the damage --
20   Q. Did you have to repair the pipes?
21   A. Yeah, we had to re -- we had to repair, uhm, the
22      damage done because of the winterization, uhm,
23      and the specifics I, I, I would, I would
24      hope -- well, I don't, I don't recall the
25      specifics.
```



Page 114

1    Q.    You don't recall the specifics of the damage to

2          the property due to Safeguard's winterizing the

3          property, is that correct?

4                        MS. GLAZER:    Objection.

5    A.    Counsel, that's not what you asked me.

6    Q.    Okay.  Do you recall the specific damage to the

7          floor?

8    A.    I do.

9    Q.    And what -- how was the floor damaged?

10   A.    I remember damage to -- there was damage to the

11         hard floors.  I, I can't give you a great

12         description --

13   Q.    Okay.

14   A.    -- of it -- or --

15   Q.    But the floors were damaged?

16   A.    -- characterization.  But the floors were

17         damaged.  Stuff was moved and there was damage to

18         the floors.  Again --

19   Q.    Okay.

20   A.    -- I know the contractor identified that as

21         something else we needed --

22   Q.    Okay.

23   A.    -- to repair, so ...

24   Q.    Who was your contractor who repaired the home?

25   A.    Wow.  I, I remember his name was Sam.



Page 115

```
 1   Q.  Sam?
 2   A.  That's -- yeah.  I'm -- that's all I've got for
 3       you on that.
 4   Q.  Do you have any documents that, any documents or
 5       agreements from the contractor setting forth the
 6       repairs that needed to be done for the house?
 7   A.  Well, I personally am, am not aware of what
 8       documents we have regarding that.  Again,
 9       Nicolette keeps all the files.
10   Q.  Okay.
11   A.  So if, if we have documents, Nicolette would have
12       them, not me.
13   Q.  Are you seeking from the Reimer firm the damages
14       and the expenses that you incurred in repairing
15       the property due to Safeguard's breaking and
16       entering into it?
17   A.  Yes.
18   Q.  Okay.  So are you seeking those as damages?
19   A.  Yes.
20   Q.  Okay.  How much did it cost to repair the
21       property?
22   A.  I don't recall.
23   Q.  Do you have any documents evidencing how much it
24       cost to repair the property?
25   A.  Me personally?
```



Page 116

1   Q.   Yes.

2   A.   Same answer as before:  Uhm, I, I personally have

3        no idea where those are being kept, but whatever

4        documents we have, Nicolette, uhm, would have

5        them, whatever there is, and, and I know that at

6        one time that there were -- we had agreements

7        with Sam and there would be documents and there

8        would be -- we, we paid him --

9   Q.   Okay.

10  A.   -- so there would be documents available.

11       Whether we have them or we have to get them from

12       some other source, I don't know.

13  Q.   So you don't know whether they've been produced

14       in this litigation?

15  A.   I don't know what Nicolette has produced.

16  Q.   Okay.  And whose responsibility was it between

17       you and Nicolette to work with Sam, the

18       contractor, to, to -- in dealing with repairing

19       the property?  I mean were you the primary person

20       he communicated with or was Nicolette?

21  A.   You know, as with many things we, we don't, we

22       don't designate relative responsibilities between

23       us; we work together on that.

24  Q.   Okay.

25  A.   So we both had numerous discussions with, with



Page 117

1       Sam during that process.

2   Q.  Okay.  Do you have any recollection of any of

3       your discussions with Sam about the process in

4       terms of repairing the house?

5   A.  I, I do recall having conversations with Sam.  I,

6       I don't recall the specifics of his explanation

7       for what damage was done due to the

8       winterization.  I do believe he thought that it

9       was done particularly, with a particular amount

10      of damage.

11  Q.  Okay.

12  A.  That I do recall.  Uhm, I don't know whether he

13      used the word -- what words he used, but, but

14      that it was -- there was something about it that

15      he, best of my recollection, that he thought was,

16      was sort of above and beyond the typical

17      winterization.

18  Q.  Okay.  But you don't have any of the documents,

19      you never really looked for them in this

20      litigation and Nicolette has the documents --

21  A.  Uhm.

22  Q.  -- relating to the, I'm sorry, relating to the

23      repair of the house?

24  A.  Yes.  Any documents that we possess --

25  Q.  Uh-huh.



Page 118

1   A.   -- to the best of my recollection, Nicolette

2        would have.

3   Q.   Okay.

4   A.   To the best of my recollection.

5   Q.   Thank you.

6        Okay.  If you look at paragraph 83 it states,

7        "On or about [June 22], 2009, Defendants and

8        their employees, subcontractors and/or agents,

9        intentionally and deliberately committed a second

10       unlawful breaking and entering into the residence

11       located at the 2498 Bristol Road...".

12  A.   Uh-huh.

13  Q.   Okay.  And do you have any specific evidence

14       that -- I'm sorry.

15       You allege that defendants broke into the

16       property.

17       Which defendants are you referring to?

18  A.   I -- do --

19  Q.   Say --

20  A.   Are you asking me to go through --

21  Q.   I'm asking you which defendants --

22  A.   -- the same process we went through before?

23  Q.   No, I'm asking you which defendants broke into

24       the property.  Because you said --

25  A.   The, the, as far as the actual physical breaking



Page 119

```
 1       into the property, Safeguard and --
 2    Q.  Okay.
 3    A.  -- they posted a notice identifying themselves as
 4       the ones breaking into the property.
 5    Q.  Okay.
 6    A.  Or on that occasion -- uhm.  Yeah, yeah, that's
 7       it.  Uh-huh.
 8    Q.  Do you have any information that the Reimer firm
 9       directed Safeguard at that time in June of 2009
10       to enter the property?
11    A.  My answer for your question regarding June 22nd
12       would be the same as your questions regarding
13       April 21st.
14    Q.  Okay.  Well, do you know whether the Reimer firm
15       was representing Chase on June 22nd, 2009?
16    A.  Well, that -- I think your question is -- no, I,
17       I don't, I don't recall and --
18    Q.  Okay.
19    A.  -- to whatever degree you're asking me for a
20       legal conclusion about the representation, I
21       wouldn't be able to answer that.
22    Q.  It's not a legal conclusion.  I'm asking you
23       whether you know --
24    A.  I don't know anything about the representation
25       agreements --
```



Page 175

1   Q.  And --

2   A.  -- custodian held -- or, or actually --

3   Q.  Yes.

4   A.  -- I don't -- your clients may have been holding

5       the note at that time.  I don't know.  I don't

6       know when they held -- I don't know.

7           But you're asking me to assess the evidence

8       that we may have regarding that particular issue,

9       and, unfortunately, I'm not in a position to do

10      that.

11  Q.  Okay.  If you look at paragraph h.

12  A.  Okay.

13  Q.  You state that "On [December 18], 2008 Defendants

14      First American, RACJ, Mr. Chernek, and Beth

15      Cottrell filed a Motion for Summary Judgement and

16      attachments falsely representing that a three

17      page note allegedly signed by Charles W. Klie

18      represents a true and accurate copy of the

19      original instrument they owned and held and that

20      the Klie account was in default from either

21      [January 1], 2008 or [February 1], 2008."

22          So what was false about the representation

23      that the three-page note was a true and accurate

24      copy of an original instrument?

25  A.  Well, that representation is on its face false,



Page 176

```
 1        based on the ultimate presentation of a five-page
 2        note, if I recall correctly, when the Court
 3        ordered your clients to turn over, or allow us to
 4        see the original note, it turned out that it was
 5        five pages and not three.
 6             So while again I'm, I'm not in a position to
 7        assess all of the evidence that we have there, I
 8        was a percipient witness to the presentation of
 9        the original note and so I do recall recognizing
10        right then and there that, that the claim that
11        the three-page note was a true and accurate copy
12        of the original instrument was simply false.
13   Q.   Okay.  Let's talk about your viewing of the note.
14             Do you know when you viewed, the first time
15        you viewed the original note?
16   A.   I don't recall.
17   Q.   Okay.  Where were you when you viewed the
18        original note for the first time?
19   A.   I don't know, but I -- to the best of my
20        recollection it was in a court outside of a, in a
21        courthouse in, in Columbus, I believe.
22   Q.   Okay.  Who was present when you viewed the note?
23   A.   Nicolette was present.  After that, I'll go with
24        I don't recall.  I believe that maybe an attorney
25        from the estate might have been present.  I
```



Page 177

```
 1       believe there was a clerk or someone
 2       would -- I -- someone -- I don't know.
 3   Q.  Okay.  And how long did you take -- how much time
 4       did you spend reviewing the note or looking at
 5       the note?
 6   A.  Oh, it was very brief.  And my recollection is
 7       we, we looked at it and we were given a copy.
 8   Q.  Who gave you the copy?
 9   A.  I don't recall.
10   Q.  Okay.  Was it an attorney?
11   A.  I don't recall.
12   Q.  Was it a female?
13   A.  I don't recall.
14   Q.  Okay.  And can you describe to me the note?
15       Describe to me what you saw.  How many pages was
16       the note?
17   A.  To the best of my recollection, the note was five
18       pages.
19   Q.  Okay.  What did it consist of?
20   A.  I don't know.
21   Q.  You don't know what it consisted of?
22   A.  I don't recall what -- I mean I don't know how to
23       answer that question.  I recall the fifth page
24       being the most interesting page.
25   Q.  What, what was the fifth page?
```



Page 184

1    A.   Okay.

2    Q.   So, now if you look at the affidavit of Nicolette

3         Glazer, it says "On [March 18], 2009 I inspected

4         a promissory note consisting of four pages, a

5         copy of said note was provided to me by

6         Plaintiff's agent and is attached to this

7         Affidavit as Exhibit A-1."

8    A.   All right.  Uh-huh.

9    Q.   So let's look at Exhibit A-1.

10   A.   Okay.

11   Q.   Okay.  So how many pages does Exhibit A-1 consist

12        of?

13   A.   It looks like five.

14   Q.   Okay.  So the affidavit states that the exhibit

15        that she viewed was four pages, but what's

16        attached here has an additional page.

17   A.   Okay.

18   Q.   Page five.

19   A.   Okay.  I'm sorry, it states where?

20   Q.   The affidavit --

21   A.   Okay.

22   Q.   -- of Mrs. Glazer --

23   A.   Okay.  Right, right.

24   Q.   -- your wife, counsel here --

25   A.   Yeah.



Page 185

```
 1    Q.    -- states, "On [March 18]...I inspected a
 2          promissory note consisting of four pages, a copy
 3          of said note was provided to me by Plaintiff's
 4          agent and is attached to this Affidavit as
 5          Exhibit...1."
 6    A.    A-1, yeah.  Uh-huh.
 7    Q.    So the first four pages.
 8    A.    All right.
 9    Q.    The first page says "Note" and it has "Page 1 of
10          3" on it.
11    A.    Uh-huh.
12    Q.    Second page has a "Page 2 of 3."
13    A.    Uh-huh.
14    Q.    The third page has "Page 3 of 3" on it, correct?
15    A.    Yes.
16    Q.    Okay.  So those three pages consist of a document
17          with a heading on it that says "Note," correct?
18    A.    Right.
19    Q.    Okay.  Now, the next page says
20          "Signature...Affidavit."
21    A.    Right.
22    Q.    Okay.  Are you contending that this is a note,
23          part of a note?
24    A.    You're asking me for a legal conclusion that
25          was --
```



MAGNA
LEGAL SERVICES

Page 186

```
 1   Q.   No, you told me the note is five pages, so I'm
 2        asking you is this Signature/Name Affidavit part
 3        of the note that you saw?
 4   A.   Well --
 5                   MS. GLAZER:  Objection.
 6   A.   -- I believe you're asking me to make a legal
 7        conclusion as to what constitutes a note, if
 8        attachments to a note are part of a note.  I'm
 9        not an expert in that and I can't offer a
10        conclusion on that.
11   Q.   Okay.  Well, Mrs. Glazer's affidavit states that
12        the note had four pages.  You said when you
13        viewed the originals that it was five pages.
14           So what is it, four or five pages?
15   A.   Well, I -- you said I stated.  Are you referring
16        to the foreclosure complaint?
17   Q.   No.
18   A.   I mean the --
19   Q.   Your testimony here was that when you viewed the
20        original note it was five pages.
21   A.   Uh-huh.  I recall the note that was turned over
22        being five pages.  I could be wrong, but I
23        recall -- I thought it was five pages.
24   Q.   Okay.
25   A.   It says "Note" up front.  If, if attachments to
```



MAGNA
LEGAL SERVICES

Page 212

1      consumer debt; and threatening to take

2      non-judicial action to effect disposition of the

3      property."

4         Do you recall how many notices were posted.

5      This is the front door.

6  A.  Uh-huh.

7  Q.  Okay.  How many notices were posted on the front

8      door?

9  A.  I do not know, nor did I ever know.

10  Q.  Okay.  Did you ever see the notices on the front

11      door?

12  A.  On the front door?  No.

13  Q.  The ones you're referencing in paragraph 104?

14  A.  Well, are you asking me if I saw notices on the

15      front door or if ever saw the notices?

16  Q.  Well, paragraph 104 states that you posted

17      conspicuous note --

18  A.  Uh-huh.

19  Q.  -- that the "Defendants...posted conspicuous

20      notices on the front door of the Bristol

21      property...".

22  A.  Uh-huh.  I never saw, to the best of my

23      recollection, a notice posted on the front door.

24  Q.  Okay.  And do you have in your possession notices

25      that you're alleging were posted to the front



Page 213

1   door?

2   A.   I don't have them in my possession.  I do not

3        know if Nicolette has any, any of those notices.

4   Q.   Okay.

5   A.   I don't know.

6   Q.   Okay.  Okay.  So you represent that the prior

7        owner of the property was deceased at the time

8        that these notices were posted, correct?

9   A.   Correct.

10  Q.   Okay.  And that the property was a probate asset

11       until July 26, 2008, correct?

12  A.   That's what it says here.

13  Q.   So would it be on July 26, 2008 that the property

14       was transferred to you?

15  A.   Well, unless there was another confusion on

16       dates.  That seems to be what the, what the --

17  Q.   Okay.

18  A.   -- what that represents.

19  Q.   And you allege that the property was not

20       abandoned, correct?

21  A.   That is correct.

22  Q.   Okay.  And you have no knowledge as to whether

23       any of the other absent class members here

24       abandoned their property that was subject to

25       foreclosure?



Page 233

```
 1   Q.   Okay.  So you're claiming lost opportunity
 2        damages in this FDCPA case now?
 3   A.   I'm attempting to explain what you read to me
 4        there.
 5   Q.   Okay.
 6   A.   And my understanding is that, as I'm listening to
 7        you, it sounds to me like what that is is a claim
 8        for lost opportunity during the foreclosure
 9        case --
10   Q.   Okay.
11   A.   -- so ...
12   Q.   So Ms. -- who investigated the -- who spent the
13        847 hours investigating the foreclosure?
14   A.   I don't have the document in front of me.  If, if
15        that's the number that's said there -- actually,
16        without having the document, I, I really can't
17        answer that question.
18   Q.   Is there a document that shows that either you or
19        Mrs. Glazer spent 847 hours investigating the
20        foreclosure?
21   A.   A document?  Define "document"?
22   Q.   You just said "I don't have the document in front
23        of me."
24   A.   You're reading from a document.  I don't have
25        that in front of me, whatever you're reading
```



Page 234

```
 1      from.
 2   Q. I'm reading from my notes.
 3   A. Oh, I'm sorry.  Okay.  Well, I don't know where
 4      you received that number, but I imagine that
 5      Nicolette sent a document to you with that.  If
 6      that's incorrect, I'm -- I stand corrected.
 7   Q. Okay.
 8   A. But I, I --
 9   Q. Okay.  Well, with respect to investigating the
10      foreclosure --
11   A. Uh-huh.
12   Q. -- did you record your time for investigating the
13      foreclosure?
14   A. I did no investigation regarding the foreclosure.
15   Q. Okay.  So you're not seeking any attorney's fees
16      or any damages with respect to your time for
17      investigating the foreclosure?
18   A. I did not investigate the foreclosure, so I would
19      not be seeking any, anything for me personally
20      regarding --
21   Q. Okay.
22   A. -- regarding investigation of the foreclosure.
23   Q. So are you claiming any as actual damages here
24      from Mrs. Glazer's time in investigating the
25      foreclosure?
```



Page 284

1   Q.  -- a citation of pages.

2           Did you review those pages --

3   A.  No.

4   Q.  -- in conjunction with reviewing these responses?

5   A.  No.

6   Q.  So you don't know whether those citations are

7       responsive to the Interrogatory No. 14?

8   A.  I have no personal knowledge about that.

9   Q.  Okay.

10                      -  -  -  -

11          (Thereupon, Defendants' Exhibit M, Email

12          Chain, Ending Date 7-10-08, with Attachments,

13          was marked for purposes of identification.)

14                      -  -  -  -

15               THE NOTARY:  Exhibit M.

16  Q.  Handing you what has been marked Exhibit M and I

17      will represent to you these are the documents

18      your counsel produced to me in response for

19      request for production of documents.  They're

20      Bates numbered GLAZER000001 through GLAZER000175.

21          Okay.  Take a minute to look through those.

22  A.  What do you want me to look for?

23  Q.  Were you involved in the gathering of any of

24      these documents that your counsel provided to me

25      in this litigation?



Page 285

```
 1              MS. GLAZER:  Objection.  To the
 2              extent if there is any responsive answer
 3              that would involve communications with
 4              counsel, do not provide such communication
 5              information.
 6    A.   Are you asking -- I want to be sure I understand
 7         your question.
 8    Q.   Okay.  That's fair.
 9    A.   Whether -- okay.  Whether as part of this
10         discover -- or of this -- your request whether I
11         was involved in the gathering or whether years
12         earlier I might have come up with --
13    Q.   This request.  Yeah, these documents.  Okay?
14    A.   No.
15    Q.   Years earlier did you look for, search for
16         documents related to this litigation?
17    A.   It's possible that if at one time I had a
18         document in my possession, Nicolette might have
19         asked me for it and I would have --
20    Q.   Okay.
21    A.   -- given to it her then.
22    Q.   Okay.  With respect to the request for production
23         of documents --
24    A.   Uh-huh.
25    Q.   -- that I served on you --
```



Page 286

1   A.   Yeah.

2   Q.   -- did you review those?

3   A.   No.

4   Q.   You did not review them and undertake any

5        investigation or search to gather any responsive

6        documents to the request for production that I

7        served?

8   A.   Not that I recall.

9   Q.   Okay.  And did -- so that means you didn't search

10       your email account to look for any documents?

11  A.   No.

12  Q.   Okay.  So I had asked for email communications

13       between you and various entities.

14            So my question is:  You did not in the last

15       several months search any of your email accounts

16       for any email communications related to this

17       litigation?

18  A.   I don't believe so.

19  Q.   Okay.

20  A.   Not to the best of my recollection.

21  Q.   Did you review any of the documents in this

22       package before your attorney sent them to me?

23  A.   I can't say if I, if I reviewed any of the

24       documents.  I can tell you I did not review the

25       package.


MAGNA
LEGAL SERVICES

Page 287

1  Q.  Okay.  Was the name of the contractor that

2      remediated your house Accurate Building Services?

3  A.  That sounds correct to me.  Best I recall that

4      was, that was the name.

5  Q.  Okay.  And are any of the documents here, because

6      I can't, I can't tell what any of this is, any of

7      the documents here invoices that were sent to you

8      for remediation of the property?

9  A.  Remediation?

10             MS. GLAZER:  Objection to form.

11 Q.  Or for renovation to the property, remediation,

12     fix the property due to the damage by Safeguard?

13 A.  Well, remediation -- okay.  I'm -- are any -- I

14     don't know what documents are here, so I can't

15     answer your question.  If you want to direct me

16     to something, I'll try.

17 Q.  Well, I don't know what any of this is, so --

18 A.  Oh.

19 Q.  -- I'm trying to figure out what documents

20     support your claim that you incurred $21,135 to

21     remedy the damages to the property as a result of

22     the two illegal entries.

23             MS. GLAZER:  Objection to form.

24 Q.  So can you identify any documents in here that

25     support your claim that you incurred $21,135 to

